**O**

# United States District Court
# Central District of California

| | |
|---|---|
| MYMEDICALRECORDS, INC., | Case No. 2:13-cv-00631-ODW(SHx) |
| Plaintiff, | |
| v. | **CLAIM-CONSTRUCTION ORDER** |
| WALGREEN CO., | **[59]** |
| Defendant. | |
| MYMEDICALRECORDS, INC., | Case No. 2:13-cv-02538-ODW(SHx) - |
| Plaintiff, | * |
| v. | |
| QUEST DIAGNOSTICS, INC., | |
| Defendant. | |
| MYMEDICALRECORDS, INC., | Case No. 2:13-cv-03560-ODW(SHx) |
| Plaintiff, | |
| v. | |
| JARDOGS, LLC; ALLSCRIPTS | |
| HEALTHCARE SOLUTIONS, INC., | |
| Defendants. | |

///

| MYMEDICALRECORDS, INC., | Case No. 2:13-cv-07285-ODW(SHx) |
|---|---|
| Plaintiff/Counter-Defendant, | |
| v. | |
| WEBMD HEALTH CORP; WEBMD | |
| HEALTH SERVICES GROUP INC, | |
| Defendants/Counterclaimants. | |

## I.  INTRODUCTION

These consolidated patent-infringement suits involve the online management of health records.  Plaintiff MyMedicalRecords, Inc. ("MMR") asserts U.S. Patent Nos. 8,301,466 and 8,498,883 against Defendants Quest Diagnostics, Inc. ("Quest"), Allscripts Healthcare Solutions, Inc. ("Allscripts"), and WebMD Health Corp. and WebMD Health Services Group (collectively, "WebMD").  MMR also asserts the '466 Patent against Empty Jar, LLC f/k/a Jardogs, LLC ("Empty Jar").  The constructions of eight terms across the '466 and '883 Patents remain in dispute.

## II.  BACKGROUND

MMR is the owner of the '446 Patent titled "Method and System for Providing On-line Records," and the '883 Patent titled "Method for Providing a User with a Service for Accessing and Collecting Prescriptions."  MMR alleges that Defendants infringe one independent claim per patent—claim 8 of the '466 Patent and claim 1 of the '883 Patent—as well as six dependent claims.

The asserted claims are method claims directed to a method for providing users with a secure and private way to collect, access, and manage medical records[1] online. Users can securely request their medical records from healthcare providers, which are received at a remote server—separate from where the healthcare providers store and maintain their respective records.  Via an interface, the patient accesses, controls, and manages the aggregated records on the server.

---

[1]  The '883 Patent is specifically directed to drug prescriptions.  The Court includes drug prescriptions within "medical records" unless otherwise indicated.

Facing several actions involving the same MMR patents, the Court consolidated the cases for claim-construction purposes on December 9, 2013.  The low number case, *MyMedicalRecords, Inc. v. Walgreen Co.*, No. 13-cv-00631-ODW(SHx), was designated as the lead case.  The lead case has since settled, but the case remains open for the purposes of filing documents pertaining to all of the MMR patent cases including claim-construction briefing.[2]

On July 1, 2014, the parties filed their final joint claim chart.  (ECF No. 69.) The parties agreed to the construction of two claim terms as follows:

| Claim Term | Agreed Construction |
|---|---|
| 1. "schedule [scheduling] one or more prescription refills" | "create [creating] a schedule for one or more prescription refills." |
| 2. ". . .wherein the step of receiving the drug prescriptions . . . is performed without providing the healthcare provider access to the server" | "wherein in the step of receiving the drug prescriptions, the healthcare provider is neither permitted to enter or upload files to the server nor to view or update files stored on the server." |

The parties dispute the construction of eight terms: (1) "healthcare provider"; (2) "from a healthcare provider associated with the user"; (3) "maintained on the server independently"; (4) "maintained separately"; (5) "managed privately by the user"; (6) "prescription refill(s)" ('883 Patent only); (7) "means for scheduling one or more prescription refills concerning a drug prescription" ('883 Patent only); and (8) "the schedule" ('883 Patent only).

On August 19, 2014, the Court held a consolidated claim-construction hearing. At the hearing, the Defendants discussed two prior-art references: U.S. Patent No. 6,988,075 (Hacker) and U.S. Patent Publication No. 2001/0041991 (Segal).   On August 21, 2014, MMR filed Objections to References not Disclosed in Compliance with Patent Local Rule 4-2(B).  (ECF No. 82.)  MMR objects to the references as improperly disclosed extrinsic evidence.  (*Id.*)   The Court addresses MMR's concerns and construes the disputed terms below.

---

[2] Citations to the docket refer to the docket in the lead case unless indicated otherwise.

1

### III.   LEGAL STANDARD

2      The purpose of claim construction is to determine the meaning and scope of the

3 patent claims alleged to be infringed.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*

4 *Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  Claim construction is a question of

5 law to be decided by the court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967,

6 979 (Fed. Cir. 1995).  In determining the proper construction of a claim, the Court

7 reviews both intrinsic and extrinsic evidence, placing emphasis on the former.

8 **A.   Intrinsic evidence**

9      The court begins with intrinsic evidence of claim meaning—which consists of

10 the claim language, patent specification, and, if in evidence, prosecution history.

11 *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *Vitronics Corp. v.*

12 *Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

13      The Court must always begin with an examination of the claim language itself.

14 *August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1284 (Fed. Cir. 2011); *see also*

15 *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998)

16 ("The claims define the scope of the right to exclude; the claim construction inquiry,

17 therefore, begins and ends in all cases with the actual words of the claim.").  Claim

18 language is paramount; the other intrinsic and extrinsic evidence—while valuable—

19 cannot be utilized to rewrite the claim language.  *SuperGuide Corp. v. DirecTV*

20 *Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

21      The terms used in the claims are generally given their "ordinary and customary

22 meaning." *Phillips*, 415 F.3d at 1312.  This "ordinary and customary meaning" is the

23 meaning as understood by a person of ordinary skill in the art ("POSITA") in question

24 at the time of the invention. *Id.*  The POSITA "is deemed to read the claim term not

25 only in the context of the particular claim in which the disputed term appears, but in

26 the context of the entire patent, including the specification." *Id.*

27      A patentee is presumed to have intended the ordinary meaning of a claim term

28 unless the patentee "(1) . . . sets out a definition and acts as his own lexicographer, or

(2) disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

The specification is "always highly relevant to the claim construction analysis." *Markman*, 52 F.3d at 978. "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. But the court must be wary of "improperly importing a limitation from the specification into the claims." *Retractable Techs., Inc. v. Becton*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).

The Court may also consider the patent's prosecution history. The prosecution history "encompasses the complete record of the proceedings before the PTO, including the prior art cited during the examination of the patent." *Id.* The prosecution history provides evidence about how the United States Patent and Trademark Office and the inventor understood the invention. *Id.* But "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

**B.   Extrinsic evidence**

Courts may also rely on extrinsic evidence to better understand the underlying technology and to determine what a POSITA would understand the claim terms to mean. *Phillips*, 415 F.3d at 1318. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert testimony, dictionaries, and learned treatises." *Id.* at 1317. But while extrinsic evidence can be useful, it is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319. Thus, it is less significant than intrinsic evidence. *Id.*

/ / /

## IV.   DISCUSSION

The Court first addresses MMR's concerns regarding the prior-art references provided to the Court at the *Markman* hearing.  Next, the Court addresses the dispute regarding the means-plus-function claim and resulting indefiniteness.  Finally, the Court will construe the remaining disputed claim terms.

**A.      *Markman* references**

At the outset the Court resolves the dispute regarding the prior-art references presented and discussed at the August 19, 2014 *Markman* hearing.  The Defendants discussed Hacker and Segal and provided printed copies of the references in their entirety to the Court.  MMR lodged its objections regarding the references at the hearing, and followed by filing Objections to References not Disclosed in Compliance with Patent Local Rule 4-2(B).  (ECF No. 82.)

Patent Local Rule 4-2(B) provides that,

> At the same time the parties exchange their respective "Preliminary Claim Constructions," each party shall also identify all references from the specification or prosecution history that support its proposed construction and designate any supporting extrinsic evidence including, without limitation, dictionary definitions, citations to learned treatises and prior art, and testimony of percipient and expert witnesses.  Extrinsic evidence shall be identified by production number or by producing a copy if not previously produced.

MMR argues that the "Court's orders clearly required disclosure of all extrinsic evidence on which a party intended to rely for claim construction." (*Id.*)

MMR's objection and arguments are specious.  First, Hacker and Segal are prior-art references discussed at length in the patents-in-suit and the '446 and '883 Patents' shared prosecution history.  Thus, they are *intrinsic*—not extrinsic— evidence. *Phillips*, 415 F.3d at 1313.  Such knowledge is axiomatic.  That Defendants / / /

1   were considerate of judicial efficiency and printed and provided the references to the

2   Court does not miraculously transform them into extrinsic evidence.

3        Second, even if Patent Local Rule 4-2(B) applied, these references were

4   disclosed to MMR in Defendants' invalidity contentions.  (ECF No. 56, Ex. C.)  Thus,

5   MMR's objections are well taken and are therefore overruled.

6   **B.    Section 112(f)**

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| 1. **"means for scheduling one or more prescription refills concerning a drug prescription"** | Not governed by 35 U.S.C. § 112(f) because sufficient structure is recited in the claim itself. | Subject to § 112(f) *and* indefinite for failure to recite structure for performing recited function. |

14       The parties dispute whether the term "means for scheduling one or more

15   prescription refills concerning a drug prescription" is governed by 35 U.S.C. § 112(f),

16   i.e., whether it is a means-plus-function claim, and if so, whether sufficiently definite

17   structure is recited in the '883 Patent.

18       Section 112(f) permits a patentee to express a claim element as a means for

19   performing a stated function.  35 U.S.C. § 112(f).  Means-plus-function claiming is

20   permitted because it is often much easier and more straightforward to claim a means

21   for doing something rather than listing all the possible ways of accomplishing the

22   task.  Under the statute, a term claimed in means-plus-function format is construed to

23   cover the corresponding structure that is described in the specification (and

24   equivalents thereof).  *See id*.

25       To utilize this form of claiming, the patentee must disclose in the specification

26   the corresponding structure for performing the claimed function with sufficient

27   particularity—and "clearly link that structure to the function."  *Triton Tech of Tx.,*

28   / / /

7

1   *LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014); *Ibormeith IP,*
2   *LLC v. Mercedes–Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Cir. 2013).

3         If the stated function "is performed by a general-purpose computer or
4   microprocessor, then the specification must also disclose the algorithm that the
5   computer performs to accomplish that function."   *Triton*, 753 F.3d at 1378 (citing
6   *Aristocrat Techs. Austr. Pty Ltd. v. Int'l Gaming Tech.*, 521 F.3d 1328, 1333 (Fed.
7   Cir. 2008)).   The patentee's "failure to disclose the corresponding algorithm for a
8   computer-implemented means-plus-function term renders the claim indefinite" under
9   § 112(b).  *Triton*, 753 F.3d at 1378; *Ibormeith*, 732 F.2d at 1379.

10         The means-plus-function analysis has two steps: first, the court determines
11   whether the claim limitation is drafted in means-plus-function format.  *Sage Prods.,*
12   *Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427–28 (Fed. Cir. 1997).  The patentee's
13   "use of the word 'means' triggers a presumption that it is a means-plus-function term,
14   but this may be rebutted if the claim itself recites sufficient structure for performing
15   the function."  *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d
16   1272 at 1306 (Fed. Cir. 2014).  Second, if the limitation is in means-plus-function
17   format, then the court reviews the specification for corresponding structure.  *Id.*

18         Here, the parties agree that the use of "means" in claim 1 of the '883 Patent
19   triggers the means-plus-function presumption.  But MMR argues that this presumption
20   is rebutted because the claim recites sufficient structure for performing the
21   "scheduling" of prescription refills.  MMR asserts that the limitation itself recites an
22   outline of an algorithm:

23       (a) receiving at the server a request directed by the user to schedule one
24       or more prescription refills concerning the drug prescription wherein the
25       prescription is associated with the request, and
26       (b) scheduling the one or more prescription refills concerning the drug
27       prescription based on the prescription and directed by the user and
28       storing the schedule on the computer readable storage medium."

(ECF No. 68, at 20; '883 Patent 16:2–10.)  The '883 Patent does not further explain how the scheduling function is performed beyond the above.  MMR asserts that a POSITA would "know and understand how to design data structures and write source code for receiving and processing these inputs."  (*Id.*)

MMR's asserted algorithm simply restates the scheduling function.  The two-step algorithm recites (1) receiving a scheduling request at the server and, (2) scheduling the refill.  Essentially, MMR argues that the corresponding structure for "means for scheduling" is . . . scheduling.[3]  This circular argument provides no additional clarity; it does not indicate to a POSITA *how* to perform the scheduling.

The § 112(f) presumption is not rebutted, because there is not sufficient structure in claim 1 to perform the scheduling function.  While necessarily "scheduling" is performed by creating a schedule, this does not limit the scope of the claim to the "corresponding structure, material, or acts" that perform the function, as required by § 112.  *Accord Triton*, 753 F.3d at 1378.

There are many discrete criteria that the scheduling may be based upon.  And there are various algorithms for scheduling—"scheduling" defines a class of structures called "schedulers."  *See Ibormeith*, 732 F.3d at 1382 (holding that disclosure of a class of algorithms "that places no limitations on how values are calculated, combined, or weighted is insufficient to make the bounds of the claims understandable.").  The bare fact that various scheduling algorithms may have been known to a POSITA cannot salvage the claims.  *Triton*, 753 F.3d at 1378 ("[A] bare statement that known techniques or methods can be used does not disclose structure." (quoting *Biomedino, LLC v. Water Techs. Corp.*, 490 F.3d 946, 953 (Fed. Cir. 2007) (internal quotations omitted)).)

---

[3] MMR additionally points to Figure 1 and the graphical-user-interface elements in Figures 7–11, which it alleges contribute to describe the operation of scheduling a prescription refill to a POSITA. An algorithm can be expressed in many forms—including flow charts, a series of specific steps, mathematical formulae, and prose.  *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008).  But these screen displays do not—on their own or in conjunction with the prose—clarify for a POSITA *how* to perform the scheduling function.

Although a person of skill in the art might be able to choose an appropriate scheduling algorithm and program it onto a microprocessor, the '883 Patent itself discloses no algorithm at all.  The specification does not explain to a POSITA which ways of performing the scheduling function are covered and which are not.  MMR is not entitled to a monopoly on every conceivable way of scheduling drug refills merely because claim 1 is written in functional language.

In exchange for expressing "means for scheduling" as a means-plus-function term, MMR was required to disclose an algorithm for performing the claimed scheduling function.  Because the patentee failed to do so, the asserted claims are indefinite.  *See Triton*, 753 F.3d at 1377–78 (affirming the district court's claim-construction order finding a means-plus-function claim indefinite for failure to recite sufficient structure).

**C.    Claim construction**

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | QUEST'S CONSTRUCTION |
|---|---|---|
| **1. "healthcare provider"** | Plain and ordinary meaning, or "a provider of health care services" | Quest: "A provider of health services that does not own, operate, or control the server" |

The presumed meaning of "healthcare provider" is the plain and ordinary meaning of the phrase.  *Phillips*, 415 F.3d at 1312.  "Healthcare provider" is a general-usage term that neither party asserts has any specialized meaning in the art.

All Defendants except for Quest agree with MMR that "healthcare provider" should be given its plain and ordinary meaning.  Quest argues that, read in context of the claims and specification, "healthcare provider" should be construed to mean "a provider of health services that does not own, operate, or control the server."  (ECF No. 72, at 17–18.)  Quest points to claim limitations that instruct that files are "managed privately by the user [and] independently from the health care provider."

('466 Patent 16:47–48; '883 Patent 16:23–25.)  Thus, Quest asserts that the applicant intended "healthcare provider" to connote a lack of control of the server.

The term "healthcare provider" does not by itself suggest anything regarding control—or lack thereof—of a server.  Other claim limitations recite restrictions regarding the healthcare provider's control of the server (*see id.*;'883 Patent 15:63–67 (receiving at the server files . . . without providing the healthcare provider access to the server)), but nothing in the claims, specification, or prosecution history indicates the applicant's intention to deviate from the customary meaning of "healthcare provider."  Because the intrinsic evidence does not mandate a specialized definition of "healthcare provider," the Court declines to depart from its plain and ordinary meaning.

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| **2.** "receiving at the server the files . . . **from a healthcare provider associated with the user**" | No construction necessary, or "wherein the files are from a health care providers associated with the user" | "wherein the files are received from the user's healthcare provider" |

The parties next dispute whether receiving files from a healthcare provider ("HCP") mandates that the health records must be received from *only* the HCP— Defendants' position—or whether they may also be received from the user—MMR's position.

As always, the Court begins by presuming that "from a healthcare provider associated with the user" retains its plain and ordinary meaning.  Defendants assert that, in view of the specification, the plain and ordinary meaning of the claim language is that the files are received at the server from the user's HCP.  MMR disagrees, and argues that the plain and ordinary meaning indicates that the files originate from a healthcare provider but do not need to be "received from" the HCP.

1     The "receiving" limitation recites that the user's personal health records user

2   are received "from a health care provider associated with the user."  ('466 Patent

3   16:35–37.)  MMR asserts that "from a health care provider associated with the user"

4   modifies the "files"—indicating the original source of the files rather than indicating

5   who makes the files available.

6     The plain meaning of "from," in light of the claims, specification, and

7   prosecution history clearly indicates that "from a healthcare provider" requires that the

8   healthcare provider send the files to the server.  The patents consistently use "from" to

9   indicate the individual that performs the relevant action.  The claimed method recites

10  five relevant actions: associating, providing, receiving, sending, and maintaining.  In

11  each of these actions, "from" is used to indicate the individual performing the

12  action—rather than as an origin identifier.

13    The parties dispute the use of "from" in one "receiving" step, but there is another

14  "receiving" step that clarifies the applicant's meaning of "from."   Immediately

15  following the step of "receiving" health records is the step of "receiving at the server a

16  request *from* the user made through the user interlace [sic] of the computing device for

17  access to the files . . . ."  ('466 Patent 16:38–40 (emphasis added)).  In this "receiving"

18  step, "from" is used to indicate the individual performing the action—here making a

19  request.   "From" is also used in the same manner in the subsequent "sending"

20  action—"sending the user a file containing the personal health records associated with

21  the user *from* the server to the computing device in response to the request."  ('466

22  Patent 16:42–44 (emphasis added)).   Thus the patents consistently use "from" to

23  indicate the individual that performs the action.  *See Phillips*, 415 F.3d at 1314 ("[A]

24  claim term should be construed consistently with its appearance in other places in the

25  same claim or in other claims of the same patent.").

26    The '883 and '466 Patents' shared specification is in accord.  Figure 1 is

27  reproduced below.  The description of Figure 1 recites that the "healthcare provider

28  **104** uses the phone **110** to communicate private voicemail messages through a toll-

free dedicated phone number to the fax/voice server **106**.  In addition, the healthcare provider faxes health or medical records **112** to the fax/voice server **106** using the toll-free dedicated phone number."  ('466 Patent 9:14–19.)



**Figure 1**

Additionally, the '466 Patent specification distinguishes prior art based on the ability of HCPs to send to the server medical records associated with the patient.  *See* '466 Patent 6:15–18 ("[one] advantage of the present invention is to allow for the health care provider to quickly and easily, yet securely, communicate records associated with an individual to the individual."); *see also* '466 Patent 2:21–23, 4:18–30, 5:2–6.  Indeed, the '466 Patent disparages the prior art for placing on the user the onus of uploading health care records, and notes the ease of error in such methods.  *Id.* at 3:45–54 (detailing problems with HeartRecord system's user uploads).

Given the clear and consistent use of "from" in the claim language and the disclosure, the plain and ordinary meaning of "from a health care provider" would be understood to mean that the healthcare provider performs the action of sending the files to the server.

/ / /

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| **3.** "maintained on the server **independently**" | Plain and ordinary meaning, *or* "stored on the server separately" | "stored on a server controlled by a party separate from the healthcare provider, wherein the healthcare provider is not permitted access to the files on the server" |
| **4.** "wherein the files are maintained **separately** from any maintained by the healthcare provider" | See above | See above |

The parties next dispute the meaning of "independently" and "separately" in context of file storage[4] on the server. The dispute over both terms condenses to whether the limitations that the files are stored independently and separately from the files maintained by the HCP mandates that the HCP cannot access the files on the server or control the server itself.

As always, the Court presumes that "independent" and "separate" retain their plain and ordinary meanings. MMR argues that the plain and ordinary meaning for both terms is "stored on the server separately," which permits HCPs to own, operate, and control the server.

The plain and customary meaning of both "separately" and "independently" both necessarily specify that the HCP cannot access the remote server storing the medical record files. Independence communicates that the files cannot be subject to control by others. Merriam-Webster's Coll. Dictionary (11th ed. 2003); The Am.

---

[4] The parties agree that "maintained on the server" means stored on the server.

Heritage Coll. Dictionary (3d ed. 2000).  Similarly, "separate" maintenance or storage of the files conveys that the medical records remain distinct to the user.  Thus, logic and linguistics dictate that the HCP cannot own, operate, or control the server if the claim language plainly states that the health-record files are stored on a server independently and separately from the files maintained by the HCP.

The specification does not indicate any intent on the part of the applicant to deviate from this ordinary meaning of "separate" and "independent" storage.  Indeed, the specification notes that one of the objects of the invention is secure and private medical-record management—"to provide for *placing an individual in control* of their medical records."  ('466 Patent 5:42–43 (emphasis added).)  The disclosure in the specification indicates the HCP does not have access to—let alone control of—the web server where the files are stored.  (*Id.* 9:16–21, Fig. 1.)  Rather, the HCP communicates with the patient through the use of dedicated phone numbers with the fax/voice server, as shown in Figure 1.  (*Id.*; *see also* '466 Patent 9:16-21, 10:15–20.)

The prosecution history is in accord.  MMR distinguished the present invention from Segal, U.S. Publication No. 200/0041991, which claimed a method of giving "each subscriber control over his/her medical information by providing immediate and continuous access for both the subscriber and his/her physicians . . . ."  ('466 File History May 14, 2012 amend. at 8 ("It is respectfully submitted that this is not taught by Segal et al. . . . .").)  MMR also distinguished from Hacker, U.S. Patent No. 6,988,075, which similarly provided for joint access to the claimed medical-record-management system.  (*Id.* Apr. 29, 2013 amend. at 15 ("The deficiencies of Segal are not remedied by Hacker, as the Hacker reference also teaches providing the healthcare provider access to the server . . . ."))

Thus, the disclosure and prosecution history are in accord with the customary meanings of "separate" and "independent" medical-record management.  Because the intrinsic evidence does not mandate a broader, specialized definition of either term, the Court cannot depart from the ordinary meaning—that the medical records are

stored on the server separately and independently from the ownership, operation, or control of the HCP.

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| **5. "managed privately [by the user]"** | Plain and ordinary, *or* "directed or controlled privately by the user" | <u>WebMD</u>: Plain and ordinary meaning<br><br><u>Allscripts, Quest, and Empty Jar</u>: "controlled and organized only by the user" |

The parties agree that "by the user" does not require any construction but dispute the meaning of "managed privately."  The patented method describes that the "(medical) files are maintained separately from any maintained by the healthcare provider prescribing the drug prescriptions and wherein the files *are managed privately by the user* and independently from the healthcare provider prescribing the drug prescriptions."  ('466 Patent claims 8–12; '883 Patent claims 1–3).

The presumed meaning of "managed privately" is the plain and ordinary meaning of the phrase.  Defendants Allscripts, Quest, and Empty Jar assert that "managed" and "privately" are ambiguous and require clarification.  Defendants assert that examination of the terms in context of the claims, specification, and prosecution indicates that the inventor intended "managed privately by the user" to mean "controlled and organized only by the user."  MMR disagrees, and argues that Defendants improperly (1) equate management with organization, and (2) read an exclusive-user-control limitation into the claim.  The disputed phrase is best interpreted by separately considering the terms "managed" and "privately."

///

///

1              *1.      "Managed"*

2         First, "manage" is a general-usage term that has a common understanding and

3    no specialized meaning in the art.  But Defendants argue that examination of the

4    specification indicates how a user might "manage" the files on the server—which is

5    beyond MMR's proposed direction-and-control[5] language.  Defendants point to the

6    specification's disclosure that "an object, feature, or advantage of the present

7    invention is to provide a method to store, *organize*, and annotate medical records."

8    ('466 Patent 5:60–62 (emphasis added)).  Moreover, Defendants assert that, although

9    "the specification is devoid of any use of the term 'manage' in connection with the

10   files, the term 'organize,' or some variation thereof, appears in the specification 14

11   times in that context."  (ECF No. 72, at 20.)  Thus, Defendants assert that the Court

12   should construe "manage" to mean "controlled and organized."

13        MMR argues that Defendants are improperly seeking to limit managing to

14   organizing—but that does not appear to be the case.  Rather, Defendants argue that the

15   claim language, read in light of the specification, clearly indicates that "the inventor

16   intended the term 'manage' to encompass 'organize.'"  (ECF No. 72 at 20.)

17        Organizing files is a "managing" action—the user is exercising control over

18   files when he organizes them into folders.  The claim language is clear on its face, and

19   the patents provide no evidence of a specialized meaning for "managed."  The

20   specification explains that a user might manage the medical files by organizing

21   them—and thus management encompasses organization—but it does not limit

22   management to organization.  Because this disclosure is in accord with the customary

23   meaning of "manage," the intrinsic evidence does not mandate a specialized definition

24   of "managed."  Thus the Court declines to depart from the plain and ordinary meaning

25   of "managed."

26   / / /

27

28   ---
     [5] Defendants do not dispute that "manage" requires at least that the user control the files.  (ECF No. 72, at 19.)

17

1          2.       *"Privately"*

2          "Privately" is also a general-usage term that has a common understanding and

3   no specialized meaning in the art.  Defendants argue that the plain meaning of

4   "privately," in the context of the patents-in-suit, connotes that only the user can

5   manage the files on the server.

6          MMR argues that Defendants confuse the claimed private management with

7   exclusive user management.   To support its argument, MMR points to the

8   specification, which describes providing access to "a third-party" in the event of a

9   medical emergency.  ('466 Patent 6:45–49, 10:62–11:14; Figs. 13–14.)  Defendants

10  counter that the read-only emergency access to the medical files disclosed in the

11  specification is not synonymous with *management* of the records.  The Court agrees.

12         The parties' dispute distills to whether "private" management of the files

13  permits anyone other than the associated user to control the medical-record files

14  uploaded to the server.  From the perspective of ordinary English, the answer is no.

15  The ordinary and accustomed meaning of "private management" necessarily directs

16  that the management ability belongs to one particular person—here, the user.  From

17  the perspective of the claim language, the answer is also no.  The '466 Patent

18  describes the method as one "wherein the files are maintained on the server

19  independently from any files maintained by the health care provider and wherein the

20  files are *managed privately by the use[r] independently from the health care*

21  *provider*."  (*Id.* 17:20–21 (emphasis added).)

22         The specification is in accord.  All embodiments and descriptions of the

23  invention describe only user management and organization of the files.  (*See, e.g.*,

24  *id.* 13:18–49, 59–67; 15:9–20.)   The specification emphasizes the importance of

25  putting the user in control of his or her medical records and who may access them.

26  (*Id.* 5:41–44 ("Yet another object, feature, or advantage of the present invention is to

27  provide for placing an individual in control of their medical records and allowing

28  / / /

them to selectively provide access to others.")  Permitting emergency-health-services providers mere access to the files does not grant them shared management authority.

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| **6. "prescription refills"** | Plain and ordinary meaning, *or* "an order including a second or subsequent supply of medication." | "An order for a second or subsequent supply of medication that is authorized by an existing prescription." |

The presumed meaning of "prescription refills" is the plain and ordinary meaning of the phrase.  "Prescription refills" is a general usage term that neither party asserts has any specialized meaning in the art.  Indeed, with the proliferation of modern medication, it would be difficult to find an individual who has not personally refilled a prescription for themselves or a family member—and is thus familiar with the ordinary meaning of "prescription refill."

Defendants do not argue that the term should not be given its presumed plain and ordinary meaning but instead argue that MMR's alternative proposed construction—"an order including a second or subsequent supply of medication"—is overly broad.  The Court agrees.  Necessarily, for a prescription to be refilled—filled a second or subsequent time—there must have been an original authorized prescription. But although Defendants' argument regarding the overbreadth of MMR's proposed alternative construction is well taken, it remains an *alternative* argument.

The claim language is clear on its face and the '883 Patent provides no evidence of a specialized meaning.  Construing "prescription refill" would add no clarity—the plain meaning clearly requires that it be a second or subsequent filling of an existing prescription.  Accordingly, the Court finds no reason to deviate from the plain and ordinary meaning of the term "prescription refill."

/ / /

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|---|
| **7. "the schedule"** | Plain and ordinary meaning, or "a designation that an event will occur" | <u>WebMD</u>: Plain and ordinary meaning,<br><br><u>Allscripts and Quest</u>: "a file, such as a calendar entry, designating the date(s) for the one or more prescription refills" |

The presumed meaning of "the schedule" is the plain and ordinary meaning. "Schedule" is general usage term that neither party asserts has any specialized meaning in the art.

Again, Defendants do not argue that the term should not be given its presumed plain and ordinary meaning. Rather Defendants argue that MMR's alternative proposed construction—"a designation that an event will occur"—is problematic for a variety of reasons, most notably, that it lacks any sort of temporal indicator (such as a date or elapsed time), which Defendants assert is inherent in a schedule.

The claim language is clear on its face, and the '883 Patent provides no evidence of a specialized meaning: claim 1 of the patent recites, in relevant part, a method that "provid[es] a means for scheduling one or more prescription refills . . . comprising: (a) receiving at the server a request directed by the user to schedule one or more prescription refills . . . (b) scheduling the one or more prescription refills . . . [and] storing *the schedule* on the computer readable storage medium." ('883 Patent 15:67–16:9). Accordingly, the Court finds no reason to deviate from the plain and ordinary meaning of the term "the schedule."

/ / /

/ / /

## V.   CONCLUSION

For the reasons discussed above, the Court adopts the aforementioned constructions of the disputed language.

**IT IS SO ORDERED.**


September 3, 2014

_____

**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**